[Cite as *State v. Johnson*, 2022-Ohio-523.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | : | Nos. 110163 and 110228 |
| v. | : | |
| ANTHONY E. JOHNSON, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** February 24, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-00-400550-ZA and CR-00-397780-ZA

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Gregory Ochocki, Assistant Prosecuting Attorney, *for appellee.*

Jennifer Paschen Bergeron and Mark Godsey, Ohio Innocence Project, University of Cincinnati College of Law, *for appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant Anthony E. Johnson ("Johnson") appeals from the trial court's denial of his motion for leave to file a motion for new trial without a hearing. For the following reasons, we reverse and remand.

**Factual and Procedural History**

{¶ 2} This appeal stems from two robberies for which Johnson was convicted during a joint bench trial for four consolidated cases in 2001.[1] This court summarized the facts of these incidents in Johnson's direct appeal as follows:

> Case CR-399616 originally involved one count each of aggravated robbery, attempted rape, kidnapping, gross sexual imposition, and receiving stolen property; the lone female victim is hereinafter referred to as MG. Case CR-400550 originally involved one count each of aggravated robbery and kidnapping; the two female victims are hereinafter referred to as BB and RS. During the course of the trial, the defense offered no witnesses in its case-in-chief.
>
> * * *
>
> CR-400550 ["parking garage robbery"]
>
> The offenses in this case occurred at approximately 6:30 to 7:00 p.m. on September 15, 2000 at the St. Maron Church parking garage located near East 12th Street and Carnegie Avenue in downtown Cleveland. Both of the female victims testified on behalf of the state.
>
> [BM] testified she and her co-worker friend, co-victim RS, had just eaten at a birthday dinner for BB and were going to BB's car, a Ford Focus coupe. It was still light out. After BB had placed some of her birthday balloons inside the rear passenger seat area of the car, and RS was standing beside the passenger side of the car, BB stood up and turned to find RS standing with a man with a green jacket. The man

---

[1] Four separate cases were consolidated for Johnson's original trial: the two robberies at issue in this appeal, a third robbery for which Johnson has maintained his innocence since trial, and a drug possession case in which Johnson pleaded guilty and has not attempted to challenge in this or any other appeal.

was holding RS with his arm around her throat holding a knife. As BB walked toward the rear of the car, she told the man that they did not have any money. BB then spotted another man out of the corner of her eye. BB began to scream and run; the other man chased her. As BB reached the Carnegie entrance to the parking garage, she heard the green-jacketed man say to his accomplice, We got the money. Let's go man. BB then fell at the entrance to the garage. BB did not see where the two assailants went, but she then returned to her car where she found RS alone inside the car. They then went to the police and made a report. Approximately ten days after the attack, BB observed a photographic array at the police station. BB focusing on the suspect's eyes and hair, picked out photo number 2 as the green-jacketed, knife-wielding assailant, after only seconds of viewing the array, and identified appellant in court as that assailant who was depicted in photo number 2.

RS, testifying for the state, generally corroborated the version of events testified to by BB. In addition, RS testified to more information. RS stated that the person that grabbed her from behind demanded that she surrender her purse. She did not get a good look at this man, but did note that he was an African-American male who wore a green windbreaker made with a rubber-type material and he pointed a knife at her throat. RS observed the other man, wearing a yellow polo shirt, advance on BB as BB started to scream and run away. The man holding RS loosened his grip and then removed the backpack purse RS was wearing over her left shoulder. RS stated that the purse contained, in part, her checkbook, credit cards, loose change, and $540 in currency which was from her cashing her payroll check. After taking the backpack, the man swung it and called to the other man that he had it. At that point, the assailants ran away. Her backpack purse, minus her money, was recovered in a nearby alley later that evening. RS was unable to identify her assailant when shown a photographic array. At the police station, RS stated on cross-examination that she perused and identified a green windbreaker, a photograph of which was admitted as State Exhibit 9, as the windbreaker which her assailant had worn.

* * *

CR-397780 ["court reporting school robbery"]

The offenses in this case occurred at 2:30 p.m. on October 9, 2000.

Victim SB testified that she and the two other victims (HP and BC) had just left classes at The Academy of Court Reporting located in The

Rockefeller Building on West 6th Street in downtown Cleveland and were going to HP's car, a four-door Ford Escort, which was parked in a nearby alley. As the ladies were looking for a lost hamster which HP believed was still in the car from that morning, a man came up behind SB, who was at the rear passenger door, bumped her and told her to get into the car. At first, SB did not obey, but changed her mind when the man displayed a kitchen butcher knife from his windbreaker jacket. SB identified the windbreaker shown in State Exhibit 10 as the appellant's windbreaker that she observed at the time of the offense. The other victims and the appellant all got into the car; HP was driving. SB sat beside the appellant in the rear seat while BC sat in the front passenger seat.

While inside the car which was heading to the projects, located in the vicinity of Cedar Avenue and East 30th Street in Cleveland which is where the appellant instructed HP to drive toward, the appellant instructed BC to hand over her purse to him; BC complied. Appellant then instructed SB to get the wallet out of BC's purse; SB found the wallet and approximately $3.00 which was inside and which was then taken by appellant. Appellant then searched SB's purse and took approximately $200 which was inside.

While the car was heading toward the projects, the appellant also bragged that he had been the subject of reporting on the front page of the local daily newspaper.

When the car reached the projects, appellant exited the car and departed, telling the victims to have a nice day as he left. The victims then drove back to the school, where the police were summoned.

SB viewed a photographic array at the Third District, but was unable to identify a suspect. The day after the robbery, SB viewed an in-person line-up of approximately eight suspects at police headquarters, at which time she identified the appellant. SB also identified the appellant in court.

Victims BC and HP generally corroborated the testimony of SB.

BC added that appellant threatened to kill all of them. BC also stated that the man who attacked them was very dark-skinned, that he locked the car doors when all were inside, and that she looked at the appellant's face in the rear-view mirror from time-to-time while the car was being driven. BC next stated that she had approximately $600 to $800 cash in her purse, but that appellant only found, and took,

approximately $2.50 which was in the change section of her wallet. BC identified a green hat with a polo emblem, see State Exhibit 8, as the hat which appellant wore during the robbery. BC also identified the windbreaker depicted in State Exhibit 10 as the same windbreaker which appellant wore during the robbery.

BC, on the day of the robbery and while separated from the other victims, identified the appellant (as depicted in photograph number 2) from a photographic array at the police station. BC also identified the appellant in court as her attacker and during a line-up at the police station.

Victim HP added that she repeatedly observed the appellant in the rear-view mirror during the robbery. HP also identified the windbreaker in evidence as the windbreaker worn by appellant during the robbery. HP also testified that appellant wore a green hat with a polo emblem during the robbery, and identified State Exhibit 8 as that hat. HP stated that appellant took $6.00 from her which she had kept in her pocket. HP identified the appellant in court as her robber. HP, while separated from BC, identified appellant as photograph number 2 in a photographic array shown to her at the police station on the day of the robbery. HP was with the police after the robbery, touring the projects area looking for the attacker, when the police located the abandoned windbreaker and hat, which HP, at the time, identified as having belonged to the robber. HP, a day or so after the robbery and without the presence of her co-victims in the line-up viewing room, identified appellant from a line-up at police headquarters.

*State v. Johnson*, 8th Dist. Cuyahoga No. 79831, 2002-Ohio-1661, ¶ 2 ("*Johnson I*").

{¶ 3} Following the bench trial, in the parking garage robbery case, the trial court found Johnson guilty of one count of aggravated robbery and one count of kidnapping, both with notices of prior conviction and repeat violent offender specifications. In the court reporting school robbery case, the trial court found Johnson guilty of two counts of kidnapping and three counts of aggravated robbery. The court sentenced Johnson to a combined sentence of 25 years. In his direct appeal, Johnson raised four assignments of error, challenging the weight and

sufficiency of the evidence, the nature of the eyewitness identification procedures, and the imposition of consecutive sentences. This court affirmed Johnson's convictions but vacated part of his sentence and remanded for resentencing. *Johnson* I at 33. Johnson appealed this court's decision in *Johnson* I, and the Ohio Supreme Court declined jurisdiction. *State v. Johnson*, 96 Ohio St.3d 1492, 2002-Ohio-4534, 774 N.E.2d 766.

{¶ 4} Since his direct appeal, Johnson has filed numerous postconviction filings. Prior to securing representation from the Ohio Innocence Project, Johnson filed a series of convoluted and seemingly contradictory pro se motions. On March 6, 2002, Johnson filed a pro se petition to vacate or set aside judgment of conviction or sentence. On April 10, 2002, Johnson filed a pro se motion for voluntary dismissal without prejudice of his March 6, 2002 petition. On April 18, 2002, Johnson attempted to undo this by filing a pro se motion to withdraw the motion for voluntary dismissal, which the trial court denied on May 16, 2002.

{¶ 5} On May 14, 2002, Johnson filed a pro se motion for DNA testing in only these two robbery cases. The same day, Johnson separately filed an affidavit, dated May 10, 2002, from Frederick Norman ("Norman"), who was then in prison for similar robberies that had occurred in the Cleveland area around the same time as the robberies for which Johnson was convicted. In this May 10, 2002 affidavit, Norman confessed that he committed the court reporting school robbery alone and admitted that he had discarded some clothing and a hat immediately following the

robbery. On July 1, 2002, the trial court denied Johnson's motion for DNA testing without a hearing, and Johnson did not appeal that judgment.

{¶ 6} On October 1, 2002, Johnson filed two pro se motions: a "motion for order finding that defendant was unavoidably prevented from discovery of new evidence in which he must rely pursuant to Criminal Rule 33(B)" and a "motion for new trial pursuant to Criminal Rule 33(A)(2)(3)" regarding the robberies. Johnson attached an additional affidavit from Norman, dated August 14, 2002, in which Norman stated that he committed the parking garage robbery alone and that Johnson did not participate in that robbery. On November 14, 2002, the trial court denied Johnson's October 1 motions without a hearing. Johnson appealed the denial.

{¶ 7} This court affirmed the judgment of the trial court, finding that the court did not abuse its discretion in denying Johnson's motion for a new trial without a hearing. *State v. Johnson*, 155 Ohio App.3d 145, 2003-Ohio-5637, 799 N.E.2d 650, ¶ 20 (8th Dist.) ("*Johnson* II"). In affirming, this court considered only the August 2002 affidavit from Norman and therefore noted that the affidavit "specifically did not address his involvement, if any, in the other consolidated case for which [Johnson] was found guilty." *Id.* at ¶ 19.

{¶ 8} On October 21, 2004, Johnson filed a pro se application for DNA testing, attaching two more affidavits from Norman: a November 6, 2002 affidavit in which Norman confirmed that he had signed the August 14, 2002 affidavit attached to Johnson's motion for a new trial, and a December 27, 2002 affidavit in

which Norman stated that he would be willing to provide DNA samples to prove that he committed both the parking garage robbery and the court reporting school robbery. On October 29, 2004, the trial court denied Johnson's application for DNA testing without a hearing. Johnson did not appeal this judgment.

{¶ 9} On February 8, 2013, having secured representation from the Ohio Innocence Project, Johnson filed a third application for DNA testing. Johnson argued that his third application was not barred by res judicata because in 2006, S.B. 262 altered Ohio's DNA statute by lowering the burden to meet the definition of "outcome determinative" and that advances in DNA testing would allow the testing of a hair without a root, and possible other DNA could be recovered and tested on the hat and jacket that were introduced as evidence at trial.

{¶ 10} On August 23, 2013, the state filed a brief in opposition to Johnson's application for DNA testing. On September 10, 2013, the trial court denied Johnson's application without a hearing, stating:

> The application fails to satisfy the statutory requirements for acceptance under Ohio R.C. 2953.74(B)(1) since he did not request or have DNA testing at the trial stage and at the trial stage, DNA testing was available. Furthermore, under Ohio R.C. 2953.74(B)(1) and (C)(5), Johnson fails to demonstrate the statutory requirement that the DNA testing could be outcome determinative, such that in light of all available evidence there would be a strong possibility that this court would not have found him guilty.

{¶ 11} On October 10, 2013, Johnson appealed.

{¶ 12} On appeal, this court unanimously reversed the judgment of the trial court, finding that DNA testing would be outcome determinative and remanding the

case for such testing. *State v. Johnson*, 2014-Ohio-2646, 14 N.E.3d 482 (8th Dist.)

("*Johnson* III").

{¶ 13} On August 20, 2015, the trial court issued an agreed order instructing the Cuyahoga County Prosecutor's office and the Cuyahoga County Sheriff's office to coordinate the DNA testing of the hat and jacket and obtain DNA samples from Norman for comparison. On September 28, 2015, the trial court issued a journal entry ordering Norman to be transported from Trumbull Correctional Institution to the Cuyahoga County Jail so that his DNA samples could be obtained.

{¶ 14} On December 11, 2015, the state filed a "supplemental report regarding chain of custody of biological material pursuant to R.C. 2953.75(B)." ("supplemental report"). The supplemental report described that the evidence to be tested was inexplicably missing, stating as follows:

> On October 14, 2014, the State filed a Report Regarding Chain of Custody of Biological Material stating that one unknown human hair (referenced in SIU Lab Report No. 409130) was available for DNA testing. Thereafter, a biological sample via buccal swabs was obtained from inmate Frederick Norman for comparison purposes. On November 18, 2015, the undersigned attempted to sign out the unknown human hair from the Cleveland Police Property Room and learned that the wrong hair – Anthony Johnson's standard instead of the unknown human hair – had been obtained from SIU and held for DNA testing. The undersigned contacted P.O. Tom Ward of the Cleveland Police Property Room and Tina Stewart, SIU Scientific Examiner, to locate the correct hair.
>
> On November 20, 2015, the undersigned was informed by Tina Stewart that the unknown human hair could not be located. Ms. Stewart provided a written report stating that "after searching the archives and various other laboratory storage areas," she was unable to locate the evidence. A copy of the report is attached hereto.

On December 9, 2015, the undersigned and P.O. Ward searched a trash bag associated with this case that is stored at the Cleveland Police Property Room. The bag had previously been searched by P.O. Ward; no items sought for DNA testing were found. In an abundance of caution, the undersigned and P.O. Ward re-searched the bag together. No items sought for DNA testing were found. None of the items found inside the bag are individually bagged or tagged for identification. The bag contains miscellaneous items including: one pair of navy nylon Nike pants; a yellow cap; a black and red Ohio State baseball cap; socks[;] two duffel bags; a fanny pack; a backpack; toiletries; a bolt cutter; a screwdriver, and pornographic material.

In sum, the sole item believed to be available for DNA testing, one unknown human hair, cannot be located.

{¶ 15} The supplemental report also indicated that the state had conveyed this information to defense counsel.

{¶ 16} On January 6, 2016, Johnson filed a motion for an evidentiary hearing to determine what happened to the missing evidence. The motion argued that an evidentiary hearing could help determine what happened to the hair between Cleveland police's 2015 confirmation that the hair was in its possession and the acknowledgement from the state that the evidence was missing. On January 11, 2016, the state filed a brief in opposition to Johnson's motion for an evidentiary hearing. The state argued that, as it described in the supplemental report, the hair that Cleveland police had represented as the unknown hair held for testing was in fact Johnson's own hair that had been collected for use as a standard for DNA testing. Therefore, according to the state, it was never in possession of the missing hair. The same day, the state filed a motion to dismiss Johnson's application for DNA testing. On January 19, 2016, Johnson filed a brief in opposition to the state's motion to dismiss.

{¶ 17} On October 19, 2016, the court held an evidentiary hearing. Eight witnesses, including representatives from the City of Cleveland Division of Police ("CDP"), the Cuyahoga County Prosecutor's Office, the Cuyahoga County Court Reporter's Office, and the Cuyahoga County Clerk of Courts. The witness testimony primarily concerned four pieces of evidence: a hat, a jacket, a bandana, and the missing hair. The witnesses described their respective interactions with and responsibility for various pieces of evidence throughout the trial proceedings in this case. They also described unsuccessful attempts to locate the evidence. According to the witness testimony, there is no record indicating that any of the evidence was ordered destroyed.

{¶ 18} Tina Stewart ("Stewart") testified in her capacity as a scientific examiner employed in the forensic laboratory at CDP. Stewart testified that at one point, the lab had in evidence a hat and bandana described as property of Johnson. Stewart explained where and when she searched for the missing hair and explained that she was unable to find it. CDP patrolman Tom Ward ("Ward"), who has worked in the CDP property room since 2001, also testified. Ward also explained searching unsuccessfully for the missing hair. Ward also testified that the hat and bandana referenced by Stewart had been signed out of the property room for court in 2001 and had never been returned to the property room.

{¶ 19} Bruce Bishilany ("Bishilany"), the Chief Court Reporter for the Cuyahoga County Court of Common Pleas, also testified. Bishilany testified as to the court reporters' office's policies for holding evidence admitted during a trial.

Bishilany further testified that he worked directly with the court reporter assigned to the case at trial to search for the missing evidence but that search did not yield any evidence or additional information. Bishilany also testified that because his office destroys records after 12 years, he could not say whether his office ever received a jacket or hat in connection with this case.

{¶ 20} Frank Kost ("Kost"), a Deputy Clerk with the Cuyahoga County Clerk of Courts, also testified at the hearing. Kost similarly testified that in his search for records and evidence in this case related to the hearing, he found an envelope of exhibits primarily consisting of photos. He did not find a hat, jacket, or hair.

{¶ 21} CDP Detective Michael Alexander ("Detective Alexander") testified at the hearing that he had worked on the investigation in this case. Alexander testified that because he had only been notified that he was subpoenaed for the hearing the previous day, he had a limited recollection of his work on the case, and he had been unable to bring any documentation related to the case to the evidentiary hearing. Detective Alexander agreed that based on the other evidence and testimony presented at the evidentiary hearing, he had signed out the hat, the jacket, and a bandana in this case for trial. He went on to testify that because the hat and jacket were admitted into evidence at trial, he would not have handled those items after trial. Detective Alexander testified that with respect to the bandana, because it was not an exhibit at trial, it would have been returned to the property room, but he had "no idea" what he did with the bandana.

{¶ 22} The court agreed to excuse Detective Alexander to allow him to check the archives of the CDP's Third District, where any of his files would have been stored after he took a new position within the department, in order to see if he could locate his file from this case.

{¶ 23} Assistant Prosecuting Attorney Mary McGrath ("McGrath") also testified at the evidentiary hearing. McGrath testified as to her knowledge of the evidence in this case as it related to orders for DNA testing beginning in February 2013. McGrath testified that in July 2013, she went to the police property room and was told by a detective that a hat and bandana had been signed out by Alexander on April 3, 2001, but were never returned. McGrath was also told that there was a trash bag of clothing in the property room, but it did not contain the hat, bandana, or jacket.

{¶ 24} On November 11, 2016, the court reconvened for a continuation of the October 19 evidentiary hearing. Detective Alexander once again testified. Having had the opportunity to check the police archives at multiple locations, along with the police supply unit, he was unable to locate "any of his files from that era," including the file from Johnson's 2001 trial.

{¶ 25} Following the hearing, the state and Johnson filed post-hearing briefs. In his post-hearing brief, Johnson requested the court issue an order granting his counsel the opportunity to personally search CDP archives for Detective Alexander's missing case files. In the state's post-hearing brief, it argued that Johnson's application for DNA testing should be dismissed because the state

exercised reasonable diligence to locate DNA evidence for testing and could not. Therefore, according to the state, Johnson failed to satisfy a statutory requirement for DNA testing because he was unable to show that a parent sample of the biological material against which a sample from Johnson could be compared still exists.

{¶ 26} On January 11, 2017, the court granted Johnson's extraordinary motion for an order to search CDP archives. The court also issued an order instructing police to preserve any evidence from this case should it be located in the future, and to notify the court of any such discovery. The parties arranged to conduct a search on February 7, 2017. On February 6, 2017, a CDP representative contacted Johnson's counsel and stated that Detective Alexander's file from this case was likely destroyed during a 2016 purge of Third District files. The February 7 search was postponed. On February 15, 2017, Johnson filed a report regarding the search for evidence in which counsel detailed subsequent efforts to ascertain whether the missing file might be located at another Third District location. Johnson's report requested that the court broaden its prior order to allow defense counsel to search the Third District's files and the archives room at police headquarters. On February 16, 2017, the state filed a brief in opposition to Johnson's request to expand the search. On March 13, 2017, the court granted Johnson's request.[2]

---

[2] On April 12, 2017, the city of Cleveland ("the city") filed a motion to intervene and vacate or modify. The city sought to vacate or modify the court's March 13, 2017 order granting Johnson's counsel access to police archives. Also on April 12, 2017, the city filed a notice of appeal of the court's March 13, 2017 order. On April 25, 2017, Johnson and the city filed an agreed judgment entry by which the parties stipulated to conducting the search in the presence of representatives from the state, Johnson, and the city, and otherwise limiting the parameters of the search. The city also agreed to dismiss its appeal

{¶ 27} On May 12, 2017, the parties conducted a search of the CDP archive. CDP Sergeant Robert Dunn ("Sergeant Dunn") produced a case file containing follow-up detective reports related to Johnson's cases. The file was labeled with a sticker listing four police report numbers and identifying Johnson as a suspect. The top of the envelope containing the file also had Norman's name handwritten across the label. None of the aforementioned evidence in Johnson's case was located, in this file or elsewhere. On May 22, 2017, the parties filed briefs summarizing the May 12 search. The state renewed its January 11, 2016 motion to dismiss Johnson's application for DNA testing.

{¶ 28} On June 16, 2017, the court issued a journal entry rejecting Johnson's application for DNA testing. On July 21, 2020, Johnson filed a motion for judicial release and a motion for leave to file a motion for new trial. In his motion, Johnson argued that because his hope of proving his innocence through court-ordered DNA testing "evaporated" after it was discovered that CDP "inexplicably lost all of the evidence" in his case, he deserved an evidentiary hearing to allow the court for the first time to hear and consider testimony from Norman regarding his confessions to the two robberies. On July 27, 2020, the state filed a brief in opposition to Johnson's motion for judicial release. The state did not file a brief in opposition to Johnson's motion for leave to file a motion for new trial.

---

and withdraw its motion to intervene. The city voluntarily dismissed its appeal on April 27, 2017.

{¶ 29} On December 21, 2020, the court denied Johnson's motion for judicial release and motion for leave to file a motion for new trial.

{¶ 30} Johnson appeals the denial of his motion for leave to file a motion for new trial, presenting two assignments of error for our review:

> I. The trial court abused its discretion by denying leave to file a motion for new trial where another man has confessed to the crimes and the defendant was unavoidably prevented from discovering that confession at the time of trial.

> II. The trial court abused its discretion by denying leave to file a motion for new trial without first holding a hearing when the defendant presented prima facie evidence that satisfied Criminal Rule 33.

**Legal Analysis**

{¶ 31} In Johnson's first assignment of error, he argues that the trial court abused its discretion by denying Johnson leave to file a motion for a new trial where another man has confessed to the crimes and Johnson was unavoidably prevented from discovering that confession at the time of trial.

{¶ 32} This court reviews the denial of a motion for leave to file a motion for new trial for an abuse of discretion. *State v. Hill*, 8th Dist. Cuyahoga No. 108250, 2020-Ohio-102, ¶ 13. An abuse of discretion is more than an error of law or judgment; it implies that the court's ruling is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 33} Crim.R. 33(A)(6) provides that a new trial may be granted on motion of the defendant:

When new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the grounds of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

{¶ 34} Crim.R. 33(B) provides that when a defendant wishes to file motion for new trial based on newly discovered more than 120 days after a verdict is rendered, they must seek leave from the trial court to file a delayed motion. *State v. Hale*, 8th Dist. Cuyahoga No. 107782, 2019-Ohio-1890, ¶ 9. To obtain leave, Crim.R. 33(B) states that the defendant must show clear and convincing proof that they were unavoidably prevented from filing their motion for a new trial. *Id.* A party is unavoidably prevented from filing a motion for a new trial if the party "had no knowledge of the existence of the ground supporting the motion * * * and could not have learned of the existence of that ground within the time prescribed for filing the motion * * * in the exercise of reasonable diligence." *Id.*, quoting *State v. Walden*, 19 Ohio App.3d 141, 145-146, 483 N.E.2d 859 (10th Dist.1984).

{¶ 35} As an initial matter, we acknowledge that the unique circumstances of this case guide our analysis. The inexplicable break in the chain of custody of critical physical evidence, despite court-ordered DNA testing of that evidence, and through no fault of Johnson, is an essential aspect of this case that we cannot ignore. This court has previously imposed a requirement that in addition to satisfying the

requirements of Crim.R. 33, a defendant filing a motion for leave to file a delayed motion for a new trial must file such a motion within a reasonable time after the new evidence was discovered. *State v. Washington*, 8th Dist. Cuyahoga No. 103875, 2016-Ohio-5329, ¶ 16, citing *State v. Stansberry*, 8th Dist. Cuyahoga No. 71004, 1997 Ohio App. LEXIS 5461, 9 (Oct. 3, 1997). The purported rationale for this requirement is to prevent defendants from "[waiting] before filing his motion in the hope that witnesses would be unavailable or no longer remember the events clearly, if at all, or that evidence might disappear," thus unfairly heightening the state's burden of potentially retrying the case. *Stansberry* at 3. This concern is inapplicable here, where Johnson has maintained his innocence for approximately two decades and, we reiterate, the particular delay in filing his motion for leave was largely the consequence of the unique circumstances of this case.

{¶ 36} Johnson's July 2020 motion for leave contained numerous exhibits, including eight affidavits from Norman prepared between 2002 and 2018 confessing to Johnson's crimes and an affidavit from Dr. Charles Goodsell ("Dr. Goodsell") highlighting the range of issues with the eyewitness identifications made in Johnson's case. Thus, Johnson's motion for leave was based on the theory, asserted in various ways throughout the duration of his case, that Johnson was misidentified as the perpetrator.

{¶ 37} In response to Johnson's arguments on appeal, the state argues that Johnson has not satisfied Crim.R. 33 because he failed to show that he was unavoidably prevented from timely filing his motion for a new trial where the

motion was supported by affidavits from 2002. The state also argues that Johnson's arguments are barred by res judicata. We disagree. With respect to the state's first argument, it ignores the tortured procedural and factual history that has brought us to this point and is therefore unpersuasive. We are likewise not persuaded by the state's argument that Johnson's motion for leave is barred by res judicata.

{¶ 38} The doctrine of res judicata provides that a final judgment of conviction bars a convicted defendant who was represented by counsel from "raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant" at trial or on direct appeal. *State v. Johnson*, 8th Dist. Cuyahoga No. 108311, 2020-Ohio-568, ¶ 15, citing *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), paragraph nine of the syllabus. Res judicata "'promotes the principles of finality and judicial economy by preventing endless relitigation of an issue on which a defendant has already received a full and fair opportunity to be heard.'" *Id.*, quoting *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824, ¶ 18. The Ohio Supreme Court has held that res judicata "is a rule of fundamental and substantial justice," and therefore "'is not to be applied so rigidly as to defeat the ends of justice or so as to work an injustice.'" *State v. Simpkins*, 117 Ohio St.3d 420, 2008-Ohio-1197, 884 N.E.2d 568, ¶ 25, quoting *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 386, 653 N.E.2d 226 (Douglas, J., dissenting), quoting 46 American Jurisprudence 2d, Judgments, Section 522, at 786-787 (1994).

{¶ 39} Although Johnson's theory of the case set forth in his motion for leave is not new, he has not been afforded the opportunity to present testimony from Norman or Dr. Goodsell at a hearing to determine whether a new trial is warranted. While the whereabouts of the missing evidence was thoroughly litigated — to no avail — at the trial court, the substance of Johnson's argument that he is entitled to a new trial based on Norman's confession as the perpetrator of his crimes has not been litigated. Therefore, Johnson's motion for leave is not barred by res judicata.

{¶ 40} We turn now to the substance of Johnson's motion for leave. The affidavits provided in support of Johnson's motion show by clear and convincing evidence that he was unavoidably prevented from timely filing his motion for a new trial. With respect to Norman's affidavits, Johnson did not even meet Norman until April 2002, well over 120 days after Johnson was convicted. With respect to Dr. Goodsell's affidavit, although Johnson has consistently maintained that he was misidentified as the perpetrator, Johnson's motion for leave was the first point at which he attempted to introduce expert evidence regarding the flaws in eyewitness identifications. The evidence submitted in support of Johnson's motion for leave is internally consistent, consistent with Johnson's longstanding claim of innocence, and consistent with this court's most recent opinion in this case, *Johnson* III. Finally, we reiterate that the state's inability to locate physical evidence in this case should not curtail Johnson's pursuit of justice, or any party's pursuit of the truth.

{¶ 41} For the foregoing reasons, we find the trial court's denial of Johnson leave to file a motion for a new trial was unreasonable. Johnson's first assignment

of error is sustained.  Our decision is limited to the narrow issue of whether Johnson should have been granted leave to file a motion for a new trial.  Because our analysis of Johnson's first assignment of error is dispositive, we decline to address his second assignment of error.

**{¶ 42}** Judgment reversed and remanded.  Upon remand, the trial court shall enter judgment granting Johnson leave to file a delayed motion for a new trial.  If Johnson files such motion within seven days of the trial court's judgment granting leave, the trial court must consider the motion in accordance with Crim.R. 33.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MARY EILEEN KILBANE, JUDGE

ANITA LASTER MAYS, P.J., CONCURS;
KATHLEEN ANN KEOUGH, J., DISSENTS (WITHOUT SEPARATE OPINION)