[Cite as *State v. Logan*, 2024-Ohio-2360.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                               :

    Plaintiff-Appellee,          :

                                          No. 112969

    v.                                           :

MONTEZ LOGAN,                            :

    Defendant-Appellant.       :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 20, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-10-540250-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Owen Knapp, Assistant Prosecuting Attorney, *for appellee.*

Kimberly Kendall Corral, and Gabrielle M. Ploplis, *for appellant.*

FRANK DANIEL CELEBREZZE, III, J.:

{¶ 1} Defendant-appellant Montez Logan ("Logan") appeals from the trial court's denial of his motion for leave to file a motion for new trial without an evidentiary hearing. For the reasons that follow, we affirm.

# I. Factual and Procedural History

{¶ 2} This appeal stems from an August 2010 case in which Logan and his codefendant, Demetrius Allen ("Allen"), were charged in a seven-count indictment: Count 1, aggravated murder of Miley Slaughter ("Slaughter"); Count 2, aggravated murder of Kenneth Green ("Green"); Count 3, attempted aggravated murder of Timothy Sisson ("Sisson"); Count 4, attempted aggravated murder of Antwon Weems ("Weems"); Count 5, attempted aggravated murder of Willie Tyson ("Tyson"); and Counts 6 and 7, having a weapon while under disability.

{¶ 3} The facts in this matter were previously summarized by this court in Logan's direct appeal, as follows:

> On July 17, 2010, Slaughter, Green, Sisson, Weems, and Tyson were socializing outside of Eric Brown's ("Brown") house located near the intersection of East 123rd Street and Signet Avenue in Cleveland[, Ohio]. The five men were gathered by Sisson's car, which was parked on the street. Tyson and Green were sitting on milk crates on the sidewalk near Sisson's car and in front of Brown's house. At approximately 8:30 p.m., the group of men were ambushed by two men, later identified as Logan and Allen.
>
> Brown testified that he observed Slaughter, Green, Sisson, Weems, and Tyson outside his home on the evening of July 17, 2010. He then heard gunshots and looked outside from his front window. He observed Allen running across the sidewalk and Brown's lawn, shooting an "SK" or an "AK" automatic gun. Slaughter was shot and fell on his back, landing on Brown's driveway. Tyson and Green then ran up Brown's driveway. Allen stood over Slaughter, told him "I got your [b**** a**]," and shot Slaughter again. Brown then pulled his front curtain shut and got down on the floor. Once the gunfire ceased, Brown went outside and observed Slaughter dead in his driveway. Brown also observed Green lying down in his backyard. Brown took off his shirt and applied pressure to Green's wounds until the paramedics arrived.
>
> Brown testified that he did not observe Logan shoot anyone, but that Logan had something in his hand. Brown could not see what it was

because he could only see Logan from his chest up. He further testified that Logan acted together with Allen. Brown testified that Logan was "hyped up shooting * * * Logan * * * was like yeah, yeah, yeah. You could tell they were together. They were the only two out there." Brown further testified that he heard more than 15 gunshots that night.

Brown recognized Allen from the neighborhood, but did not know his name. Initially, Brown was hesitant to speak with the police. Brown did not want to be labeled a "snitch." However, Brown eventually spoke with the police. Brown identified both Allen and Logan as the assailants in a photo array and in court.

Weems testified that he was leaning on Sisson's car when he heard gunshots. He was shot in his right foot and ran away in the same direction as Sisson. He testified that he saw Allen with a gun. He further testified that he observed Slaughter fall to the ground. Weems testified that he knew Logan and Allen. Weems went to high school with Logan and knew the mother of Allen's child. Weems testified that initially he was hesitant to speak with the police, indicating that he wanted to avenge the crime himself. However, Weems eventually gave a statement to the police and identified both Allen and Logan as the assailants in a photo array and in court.

Sisson testified that the five of them were gathered outside his car when he heard gunshots. At first, he heard three gunshots, then he heard a rapid succession of gunshots. He observed Allen with a gun. Slaughter was shot and lying on the ground. Weems was also shot. Sisson testified that Weems's "foot was shot off." Sisson ran away from the gunfire. He testified that his foot was grazed by a bullet and that he had to go to the hospital for treatment.

Tyson testified that both Logan and Allen began shooting at them. Tyson and Green tried to escape by running up Brown's driveway, but Green was shot and could not keep up with Tyson. Tyson hid in a neighbor's garage until the gunfire ceased. When he returned to the scene, he found Slaughter dead in Brown's driveway and Green lying on the ground in Brown's backyard.

Logan and codefendant Allen both testified on their own behalf. Logan testified that Allen and he are like brothers. On July 17, 2020, they picked up Allen's brother, Deandre Allen ("Deandre"), and Deandre's friend, Dapolo Green ("Dapolo"), at East 118th Street and Kinsman. Allen was driving a van. The four of them went to a shoe store located at the intersection of Harvard and Lee Road. They were at the shoe

store for approximately 30 minutes. Allen and Logan then drove Deandre and Dapolo back to Allen and Deandre's home in Garfield Heights. After that, they drove to a liquor store and returned to their friend's house on East 93rd and Aetna in Cleveland. Logan testified that he heard about the shooting after he arrived at his friend's house. His friend received a call around 9:00 p.m. and relayed the information to Allen and Logan. Logan denied shooting at the victims, testifying that Allen and he were selling drugs that night and making money.

Allen also testified that Logan and he picked up Deandre and Dapolo at East 118th Street and Kinsman around 6:30 p.m. The four of them went to a shoe store for approximately 30 minutes. Allen and Logan then drove Deandre and Dapolo back home in Garfield Heights at approximately 8:00 p.m. After that, they stopped at a liquor store before 9:00 p.m. and returned to their friend's house on East 93rd and Aetna. Allen also testified that he heard about the shooting after he arrived at his friend's house. Allen also denied shooting at the victims, testifying that Logan and he were selling drugs that night and making money.

Deandre testified as an alibi witness. Deandre testified that on July 17, 2010, Deandre and Dapolo, who is Green's cousin, met Allen and Logan around 6:30 p.m. at East 118th and Kinsman. Allen drove Logan, Deandre, and Dapolo to the shoe store around 7:00 p.m., where they stayed for a half-hour. Allen and Logan then drove Deandre and Dapolo back to Garfield Heights around 8:30 p.m. Deandre testified that neither Allen nor Logan were outside of his presence from the time they met at the shoe store until they dropped him off back home. Deandre denied riding a bicycle by Cook's house on July 16, 2010. He further denied speaking with Dapolo that day, advising Dapolo that Allen and his friends are going to come and "shoot the block up."

On cross-examination, Deandre admitted that he was only with Allen and Logan for a short time on the night in question. Deandre testified that the first time he saw Allen and Logan that day was at 6:30 p.m. He further testified that he did not see them again that night after they brought him back home at approximately 8:20 p.m.

The state called Dapolo as a rebuttal witness. Dapolo testified that on July 16, 2010, he was gathered outside Cook's house with Green, Slaughter, Tyson, and Weems when Deandre came by riding a bike. Deandre asked to speak with Dapolo. After they spoke, Dapolo returned to Cook's house and spoke with Green and Slaughter. Dapolo testified that on July 17, 2010, he met up with Deandre at East 118th

and Kinsman, where Allen and Logan picked them up and took them to the shoe store. They were at the shoe store for about [a] half-hour and then they drove back to Allen and Deandre's home. Dapolo then walked to the corner store and returned back to Deandre's house. When he returned, Deandre was the only one there, Allen and Logan had left.

*State v. Logan*, 2012-Ohio-1944, ¶ 5-16 (8th Dist.) ("*Logan I*").

{¶ 4} Also relevant to this appeal, Weems specifically testified at trial that while he was in the hospital receiving treatment, Christopher Perkins ("Perkins") visited him in the hospital and relayed to him that Logan and Allen were the parties involved in the shooting. (Tr. 1344-1345, 1411.) Even though Weems had gone to high school with Logan and knew Allen through a mutual acquaintance, he did not remember Logan's and Allen's names until Perkins reminded him. Perkins did not participate in the trial, and investigators denied ever interviewing him in connection with this incident, despite learning his name from Weems. (Tr. 1756.)

{¶ 5} At the close of trial, a jury found Logan guilty of all charges and specifications, and Logan received a sentence of 46 years to life, which this court affirmed in *Logan I*. *Id.* at ¶ 2, 17. The Ohio Supreme Court declined to review our decision in *Logan I*. *State v. Logan*, 2012-Ohio-4021. This court also denied Logan's application to reopen *Logan I*. *State v. Logan*, 2012-Ohio-5713 (8th Dist.).

{¶ 6} On April 7, 2023, Logan filed a motion for leave to file a motion for new trial. Logan's motion was premised on "potentially favorable information" — an affidavit prepared by Perkins averring that he did not visit Weems in the hospital

following the incident, as well as an affidavit signed by Weems, corroborating that he was untruthful in stating that Perkins told him the identities of Logan and Allen.

{¶ 7} Weems's affidavit, dated November 5, 2021, averred:

I, Anton Weems, swear that I voluntarily provided this statement to [private investigator] Tom Pavlish.

I knew Montez Logan & Demetrius Allen from the neighborhood. I went to school with Montez. I never had problems with neither men [sic].

I did not see who shot any of us on July 17, 2010. Chris Perkins <u>NEVER</u> saw me in the hospital.

I only identified Tez & DJ because the prosecutor told me that I would get probation for [the] case I was locked up on.

They came to interview me before this. I only decided to <u>lie</u> for me [sic] freedom.

All the information I gave the police was not first hand [sic] knowledge of what I saw with my [own] eyes.

I deeply apologize for lying. I was just trying to get home.

(Emphasis in original.)

{¶ 8} Perkins in his affidavit dated November 26, 2020, averred:

I, Chris Perkins, swear that I voluntarily provided this statement to [private investigator] Tom Pavlish.

I was not present on July 17, 2010[,] when Miley Slaughter, Kenneth Green and Antwon Weems were shot.

I never went to Metro Hospital to visit [Weems].

I never told him that Demetrius Allen or Montez Logan were the shooters.

I have no idea why he is stating that I did.

No one ever interviewed me about this incident.

**{¶ 9}** In addition to the Perkins and Weems affidavits, Logan included records from Garfield Heights Municipal Court ("the Garfield Heights records") showing that Dapolo was not completing his community service obligations on July 17, 2010, as he testified at trial. This, according to Logan, raised questions surrounding Dapolo's credibility during trial.

**{¶ 10}** It should be noted that Allen, Logan's codefendant, filed a motion for leave to file a motion for new trial premised on the exact same "newly discovered evidence" that Logan premised his motion for leave to file a motion for new trial on: the Perkins affidavit, the Weems affidavit, and the Garfield Heights records. The trial court denied Allen's motion for new trial, which was appealed to this court. This court affirmed the denial in *State v. Allen*, 2024-Ohio-970 (8th Dist.) ("*Allen II*").

**{¶ 11}** On June 1, 2023, the State filed a brief in opposition to Logan's motion for leave to file a motion for new trial.

**{¶ 12}** On June 13, 2023, the trial court denied Logan's motion for leave to file a motion for a new trial.

**{¶ 13}** Logan filed a notice of appeal and presents five assignments of error for our review:

> I. The trial court abused its discretion in denying Montez Logan's motions for leave to file a motion for a new trial as the evidence presented meets the requisite standard required under Crim.R. 33.

> II. The trial court abused its discretion in failing to hold an evidentiary hearing, as Logan established unavoidable prevention and the affidavits presented meet the *Calhoun* standard.

III. The trial court abused its discretion when it failed to hold an evidentiary hearing, especially in light of the state's opposition evidencing a misunderstanding of *Brady*.

IV. The trial court abused its discretion as evidenced by failing to identify the correct legal standard or state findings demonstrating its application of the correct legal standard.

V. It is a per se abuse of discretion when the court gives dispositive weight to judicial efficiency over every other princip[le] and purpose of criminal justice.

## II. Law and Analysis

{¶ 14} Before discussing the assigned errors, we find it necessary to emphasize the unique posture of Logan's motion for leave to file a motion for new trial. This court, in *Allen II*, 2024-Ohio-970 (8th Dist.), reviewed and considered the same evidentiary materials attached to a motion for leave to file a motion for new trial: the Perkins and Weems affidavits and the Garfield Heights records. It would be simple for this court to cite *Allen II* as precedent, follow it, and affirm the trial court's denial of Logan's motion for leave to file a motion for new trial. We note, however, that while some of Logan's arguments align with those that Allen advanced that were rejected by this court, some are novel and characterized under different precedents and standards. Therefore, this opinion will focus on Logan's specific arguments that differ from those addressed in *Allen II*.

{¶ 15} We note two differences between Allen's and Logan's motions for leave to file a motion for new trial. Logan included the full transcript of private investigator Tom Pavlish's conversation with Weems, which Allen did not. Further, Logan characterizes his "newly discovered evidence" under two precedential cases

that were not argued or cited by Allen. Specifically, Logan characterizes the affidavits and Garfield Heights records as persuasive under *State v. Calhoun*, 86 Ohio St.3d 279 (1999), and *Brady v. Maryland*, 373 U.S. 83 (1963).

{¶ 16} This court reviews the denial of a motion for leave to file a motion for new trial for an abuse of discretion. *State v. Johnson*, 2022-Ohio-523, ¶ 32 (8th Dist.), citing *State v. Hill*, 2020-Ohio-102, ¶ 13 (8th Dist.). The decision on whether to hold a hearing on the motion is also reviewed for an abuse of discretion. *State v. Phillips*, 2017-Ohio-7164, ¶ 21 (8th Dist.), citing *State v. Sutton*, 2016-Ohio-7612, ¶ 13 (8th Dist.). The term abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 17} Crim.R. 33(A)(6) provides that a new trial may be granted on motion of the defendant

> [w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

{¶ 18} Crim.R. 33(B) provides that when a defendant wishes to file a motion for new trial based on newly discovered evidence more than 120 days after a verdict is rendered, the defendant must seek leave from the trial court to file a delayed motion. *State v. Hale*, 2019-Ohio-1890, ¶ 9 (8th Dist.). To obtain leave, the defendant must clearly and convincingly demonstrate that they were unavoidably prevented from filing their motion for a new trial. *Id.* "'Clear and convincing' evidence is that 'measure or degree of proof' that 'produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Allen II*, 2024-Ohio-970, at ¶ 21 (8th Dist.), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. Therefore, the sole question before the trial court "when considering whether to grant a motion for leave based on newly discovered evidence is whether the defendant has established by clear and convincing proof that he or she was unavoidably prevented from discovering the evidence at issue within the time frame provided," not the merits of the proposed motion for a new trial. *Id.* at ¶ 22, citing *State v. Hatton*, 2022-Ohio-3991, ¶ 30, 33; *Hale* at ¶ 20. A defendant is entitled to a hearing on his or her motion for leave to file a motion for new trial only if the submitted documents demonstrate that the defendant was unavoidably prevented from timely discovering the grounds for the motion. *Allen II* at ¶ 23.

{¶ 19} Relevant to this matter are two distinct methods of demonstrating the "unavoidably prevented" requirement.

{¶ 20} First, a defendant may make the required showing that he or she was "unavoidably prevented"[1] from filing a timely motion for a new trial based on new evidence by demonstrating that he or she was previously unaware of the evidence on which the motion relies and could not have discovered it within the required time by exercising reasonable diligence. *Id.* at ¶ 26, citing *State v. Johnson*, 2024-Ohio-134, ¶ 18; *Bethel* at ¶ 21; *State v. McFarland*, 2022-Ohio-4638, ¶ 16 (8th Dist.).

{¶ 21} Second, a defendant may make the required showing by establishing that the prosecution suppressed the evidence at issue. *Allen II*, 2024-Ohio-970, at ¶ 27 (8th Dist.), citing *Bethel* at ¶ 25. ("[W]hen a defendant seeks to assert a *Brady* claim in an untimely or successive motion for postconviction relief, the defendant satisfies the 'unavoidably prevented' requirement contained in R.C. 2953.23(A)(1)(a) by establishing that the prosecution suppressed the evidence on which the defendant relies."); *Johnson* at ¶ 16, 18 (a petitioner who files an untimely or successive petition for postconviction relief may show that he or she was unavoidably prevented from discovering the evidence on which the petition relies "by establishing a violation under [*Brady*, 373 U.S. 83]"); *State v. McNeal*, 2022-Ohio-2703, ¶ 17 ("[A] defendant may satisfy the 'unavoidably prevented' requirement contained in Crim.R. 33(B) by establishing that the prosecution suppressed the evidence on which the defendant would rely in seeking a new trial.").

---

[1] The Ohio Supreme Court has held that the "unavoidably prevented" requirement in Crim.R. 33(B) is identical to the "unavoidably prevented" standard as espoused in R.C. 2953.23(A)(1), governing postconviction-relief petitions. As such, caselaw cited herein dealing with our analysis of the "unavoidably prevented" requirement may pertain to either Crim.R. 33(B) or R.C. 2953.23(A)(1). *State v. Bethel*, 2022-Ohio-783, ¶ 59.

## A. "Unavoidable Prevention" Required Under Crim.R. 33

{¶ 22} Logan's first assignment of error addresses the first method of demonstrating that a defendant was "unavoidably prevented" from discovering the evidence advanced in a motion for leave to file a motion for new trial, as espoused in Crim.R. 33.

{¶ 23} Logan's arguments relating to this first method are nearly identical to those advanced by Allen.

{¶ 24} In reference to the affidavits, Logan argues that he "did not learn of the witnesses' decision to come forward and do the right thing until after the 120-day window ha[d] closed." This court was not persuaded by these arguments when Allen advanced them and is unpersuaded by Logan's attempts to argue them now. Indeed, the *Allen II* Court's conclusion that "there is no evidence in the record detailing Allen's efforts, if any, to timely obtain an affidavit from Perkins or Weems or establishing why any such efforts would have been unavailing," holds true for Logan as well. *Id.*, 2024-Ohio-970, at ¶ 34 (8th Dist.).

{¶ 25} Unlike Allen, however, Logan cites the interview transcript between private investigator Tom Pavlish and Weems wherein Weems "explicitly provided that he testified falsely against Logan in order to secure a deal with the prosecution and ensure his freedom pursuant to unrelated charges." Despite this extra piece of evidence, we are unpersuaded that this "moves the needle" so as to demonstrate that Logan is entitled to leave while Allen was not.

{¶ 26} Logan also references the photo lineups shown to Weems and Brown and argues that several issues such as two different photographic lineups and media exposure tainted these identifications, which in turn "demonstrate[s] why the trial court should have considered the affidavits of Weems and Perkins in support of his motion [as] *more credible* than the state's evidence as presented at trial." (Emphasis in original.) Put simply, this argument is speculative and unsupported by any evidence provided. After thorough and careful consideration of this argument, we cannot say that the trial court abused its discretion in rejecting this argument and declining to grant leave.

{¶ 27} In reference to the Garfield Heights records under this assignment of error, we reference and incorporate the analysis set forth in *Allen II*, 2024-Ohio-970, at ¶ 39-43 (8th Dist.).

{¶ 28} Based on the foregoing, we overrule Logan's first assignment of error.

## B. The *Calhoun* Standard for Affidavits

{¶ 29} In his second assignment of error, Logan advances an argument that the Perkins and Weems affidavits were credible under *Calhoun*, 86 Ohio St.3d 279, and therefore, should have been considered adequate under Crim.R. 33.

{¶ 30} In *Calhoun*, the Ohio Supreme Court provided a list of factors for courts to consider in assessing the credibility of a witness affidavit:

> (1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise

interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial. Moreover, a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony.

*Calhoun* at 285, citing *State v. Moore*, 99 Ohio App.3d 748 (1st Dist. 1994).

{¶ 31} After a careful review of the affidavits, we find that we need not reach the issue of credibility because the contents of the affidavits, even if found credible, fail to demonstrate a prima facie claim that Logan was unavoidably prevented from discovering the content therein. We cite all of the analysis employed under the first assignment of error, but also note the following specific to the nature of the affidavits.

{¶ 32} In reviewing Weems's affidavit, we note that it is to be treated as an affidavit recanting Weems's initial testimony. At trial, Weems maintained that Perkins visited him in the hospital and "reminded" him of the names of Allen and Logan, two people who he recognized but was not able to name. In his affidavit, Weems maintains that Perkins did not visit him in the hospital and that he went along with the State's case to receive favorable treatment for one of his own cases. This directly contradicts his testimony at trial that he had not received any favorable treatment in exchange for his testimony.[2] Evidence that merely contradicts former

---

[2] Weems verified several times at trial that he was not coerced into or promised anything in exchange for his testimony:

[THE STATE]: Mr. Weems, were you promised anything to get you to come in here and testify?

evidence is insufficient under Crim.R. 33. *State v. White*, 2017-Ohio-6984, ¶ 24 (8th Dist.), citing *State v. Howard*, 2015-Ohio-2854, ¶ 54 (8th Dist.).

{¶ 33} Further reviewing the affidavits, in *Johnson*, 2024-Ohio-134, at ¶ 27, the Ohio Supreme Court held that a petitioner must "submit evidence of specific facts beyond the supporting affidavit's date to explain why the petitioner was unable to timely obtain an affidavit from the recanting witness." This is exactly the argument that Logan relies on.

{¶ 34} Logan argues that he was prevented from obtaining these affidavits unless and until Weems came forward. We found this argument insufficient in *Allen II*, 2024-Ohio-970 (8th Dist.), and we find it insufficient here as well. Even considering the transcript from the interview with Tom Pavlish, we again conclude that it does little to move the needle in establishing the "unavoidably prevented"

---

[WEEMS]: No, sir.

[THE STATE]: Did I or the police department or anybody promise to do anything for you in return for you coming in and cooperating?

[WEEMS]: No, sir.

(Tr. 1351.)

[THE STATE]: Did anyone tell you what to say here?

[WEEMS]: No, sir.

[THE STATE]: When you met with me, did I tell you what to say?

[WEEMS]: No, sir.

(Tr. 1416.)

requirement. This is especially persuasive because Weems was not under oath during the interview, and his affidavit avers only that he was "trying to get home," without elaborating on any potential deal he was offered or even any details regarding the supposedly outstanding case that Weems had at the time.

{¶ 35} The Perkins affidavit is not a recantation because Perkins never testified at trial. However, as we concluded in *Allen II*, "Allen and his defense attorneys were well aware of the existence of Perkins and his role in the case at the time of trial — if not before. Multiple witnesses, including Weems and police detectives, testified regarding the fact Perkins had allegedly told Weems the names of the men involved in the shooting." *Id.* at ¶ 36. We again reiterate that pursuant to *White* and *Howard*, merely contradictory evidence, without more, is not sufficient to support a motion for new trial.

{¶ 36} Without even considering the credibility of the affidavits, we are unable to conclude, based on the contents alone, that they meet the threshold standard that Logan bore the burden of proving to demonstrate that he was unavoidably prevented from discovering the contents of the affidavits. Accordingly, we need not and refuse to reach any credibility conclusions about the affidavits themselves pursuant to *Calhoun*.

{¶ 37} Logan's second assignment of error is overruled.

## C. *Brady* Material

{¶ 38} In his third assignment of error, Logan argues that the Garfield Heights records constitute *Brady* material and therefore, satisfy the second method

of showing that the defendant was "unavoidably prevented" from discovering the evidence at issue. Allen did not characterize this evidence as *Brady* material, so we proceed to analyze the Garfield Heights records under the *Brady* standard.

{¶ 39} In *Brady*, 373 U.S. 83, the Supreme Court of the United States held that "a state violates the Fourteenth Amendment to the United States Constitution when it 'withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment.'" *Bethel*, 2022-Ohio-783, at ¶ 19, quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012) (summarizing *Brady's* holding). Further, there are three components of a true *Brady* violation: "'the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; the evidence must have been suppressed by the state, either willfully or inadvertently; and prejudice must have ensued.'" *Id.*, quoting *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

{¶ 40} While a *Brady* violation can form the basis for a motion for leave to file a motion for new trial, Logan has not made a prima facie showing of a *Brady* violation here. With respect to evidence regarding Dapolo's community service, we note that this evidence was a public record that was equally available to the prosecution and defense at the time of the trial. *State v. McGuire*, 2018-Ohio-1390, ¶ 24 (8th Dist.), quoting *United States v. Delgado*, 350 F.3d 520, 527 (6th Cir. 2003) ("*Brady* does not apply to materials that are not 'wholly within the control of the prosecution.'"). It is specious to claim that the State either willfully or inadvertently withheld this information, and it is even more specious to suggest, without more,

that misremembering a detail such as a date that Dapolo had been engaging in community service prejudiced Logan. Further, Dapolo's testimony about his community service obligations was subject to cross-examination at trial.

{¶ 41} Finding no merit in Logan's *Brady* argument, Logan's third assignment of error is overruled.

## D. Factual Findings and Judicial Efficiency

{¶ 42} In Logan's fourth assignment of error, he argues that the trial court abused its discretion by failing to identify the correct legal standard or state findings demonstrating its application of the correct legal standard. In Logan's fifth assignment of error, he argues that it is a per se abuse of discretion when the court gives dispositive weight to judicial efficiency over every other principle and purpose of criminal justice. We address these assignments of error together for ease of discussion.

{¶ 43} This court has recently concluded that while it is a "best practice" for a trial court to issue findings of fact and conclusions of law in connection with motions for leave to file a motion for new trial, it is not explicitly required by Crim.R. 33. *State v. Smith*, 2024-Ohio-1360, ¶ 82 (8th Dist.), citing *Sutton*, 2016-Ohio-7612, at ¶ 26 (8th Dist.); *State v. Hillman*, 2020-Ohio-5597, ¶ 6-7 (10th Dist.). *Smith* also cites to *State v. Gibson*, 2023-Ohio-4792, ¶ 14, fn. 1 (8th Dist.), which interpreted the Ohio Supreme Court's decision in *State v. Miller*, 2023-Ohio-3448, as "a split decision without a majority" but indicating, by agreement of the concurrence and dissent, that trial courts *should* making findings of fact and

conclusions of law when deciding whether to grant leave to file a motion for new trial.

{¶ 44} In the absence of any findings of fact or conclusions of law, the record is devoid of the trial court's reasoning for its denial of Logan's motion. Despite this, Logan's fifth assignment of error is based on his unfounded perception that the trial court's ruling was based on nothing more than judicial efficiency. Because this perception is not based on anything in the record, we find this argument meritless and summarily overrule it.

{¶ 45} Logan's fourth and fifth assignments of error are overruled.

### III. Conclusion

{¶ 46} The trial court did not abuse its discretion in concluding that Logan did not meet the evidentiary standard required for a hearing on his motion for leave to file a motion for new trial, nor did the trial court abuse its discretion in failing to hold a hearing on such motion because the motion for leave did not indicate that a hearing was necessary.

{¶ 47} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK DANIEL CELEBREZZE, III, JUDGE

KATHLEEN ANN KEOUGH, A.J., CONCURS;
MARY EILEEN KILBANE, J., DISSENTS (WITH SEPARATE OPINION)

MARY EILEEN KILBANE, J., DISSENTING:

{¶ 48} I respectfully dissent from the majority opinion. I would reverse the trial court's denial of Logan's motion for leave to file a motion for a new trial without an evidentiary hearing and remand the case.

{¶ 49} Specifically, I disagree with the majority's analysis regarding Logan's *Brady* claims. "[W]hen a defendant seeks to assert a *Brady* claim in an untimely or successive motion for postconviction relief, the defendant satisfies the 'unavoidably prevented' requirement contained in R.C. 2953.23(A)(1)(a) by establishing that the prosecution suppressed the evidence on which the defendant relies." *State v. Allen*, 2024-Ohio-970, ¶ 27 (8th Dist.), quoting *State v. Bethel*, 2022-Ohio-783, ¶ 21; *State v. Johnson*, 2024-Ohio-134, ¶ 16.

{¶ 50} Unlike in *Allen*, Logan characterizes the new evidence in his motion as *Brady* material. Specifically, Logan argues that both Weems's assertion that he testified against Logan in exchange for favorable treatment in his own unrelated case, as well as the Garfield Heights documents regarding Dapolo's community service, constitute *Brady* material. The majority's analysis of Logan's *Brady* claims

is limited to the Garfield Heights documents. I believe that Weems's affidavit, in which he not only recants his trial testimony but specifically asserts that he testified against Logan in exchange for favorable treatment from the State of Ohio, demonstrates a prima facie showing of a *Brady* violation.

{¶ 51} In support of his motion for leave, Logan attached an affidavit from Weems and a transcript of Pavlish's interview with Weems showing that Weems's testimony against Logan at trial was motivated by Weems's desire to resolve his own unrelated criminal cases. Indeed, following the trial in the instant case, Weems's cases were resolved. While the State argues that Weems is unable to provide any additional details about his alleged plea deal with the State, we note that this sort of information is exactly the type that the trial court would be able to elicit at an evidentiary hearing on Logan's motion.

{¶ 52} Therefore, I would find that the trial court abused its discretion in denying Logan's motion for leave to file a motion for a new trial without an evidentiary hearing.

{¶ 53} For these reasons, I respectfully dissent.